RECEIVED

SEP - 6 2005

ROBERT H. SHEMWELL. CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| | | |
|---|---|---|
| **LAZELLE P. CLARK** | * | **CIVIL ACTION NO. 04-2353** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Lazelle P. Clark, born November 3, 1966, filed an application for disability insurance benefits on February 24, 2003, alleging disability as of March 10, 1999, due to high blood pressure, hip and back problems, anxiety, and depression.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[1]

**(1) Records from The Family Clinic dated March 11 to April 8, 1999**. On March 11, claimant complained of pulling something in her left leg after unloading a patient on the previous day. (Tr. 129). She had tenderness to palpation of the left-medial groin musculature and increased pain with abduction of the hip. Dr. Michael Basile's assessment was muscle strain of the left groin, for which he prescribed ice compresses, Skelaxin, Relafen and Darvocet.

After attending physical therapy, claimant reported on March 26 that she had improved. (Tr. 125). However, on April 8, she complained that she had hip swelling after therapy. (Tr. 124). Since then, she had had left hip pain which caused her to fall and injure her back.

Examination of the low back was really unremarkable, but claimant did have tenderness to palpation over the left greater trochanter. The DTR was 2+ bilaterally and symmetrical. Dr. Basile's assessment was muscle strain of the groin and left hip pain.

---

[1]The record reflects that claimant is insured for disability benefits through December 31, 1999. (Tr. 15). Therefore, she must establish disability on or prior to that date. Accordingly, while all of the records were reviewed by the undersigned, only those relating to the relevant time period are summarized herein.

**(2) Records from Dr. Frazer Gaar dated April 14 to July 26, 1999**.

Claimant complained of pain across her low back into her left hip and leg and right shoulder pain after a work-related accident on March 10. (Tr. 258). She had felt better after having physical therapy, but then her left hip and leg gave out while she was walking in her kitchen.

On examination, cervical and right shoulder motion was full. She had no crepitation or evidence of internal derangement in the right shoulder. Neurological testing in the upper extremities was intact. Lumbar motion was limited to 50 percent of normal. Forward bending caused pulling pain across the low back, but there was no radicular component. Straight leg raising caused low back pain, but no radiculitis. (Tr. 259).

Claimant's knee and ankle reflexes were physiologic. Sensory examination was normal. She had adequate motor strength, and strong extensor hallucis bilaterally.

X-rays of the lumbar spine, pelvis and right shoulder were within normal limits. Dr. Gaar's impression was left low back and hip strain. He recommended that claimant resume physical therapy.[2] He told claimant that she needed to think about

---

[2]The record contains physical therapy reports from LeBlanc, Chamberlain & Martin dated May 17, 1999 to June 7, 2000, and Physical Therapy Services of Church Point dated January 20 to February 24, 2000. (Tr. 261-67; 277-88).

getting back to some work activity. He prescribed Celebrex.

An MRI taken on April 20, 1999 was normal. (Tr. 257). On April 26, claimant was feeling somewhat better since she had been attending therapy. (Tr. 256). She continued to complain of some discomfort across the low back with increased activities. Neurological exam was unchanged. Dr. Gaar encouraged her to stay active and continue with therapy.

On June 23, claimant complained of pain over the left hip. (Tr. 253). She had tenderness over the greater trochanter. On examination, she was neurologically intact. Dr. Gaar injected her with Celestone and Marcaine, and recommended continued therapy.

On July 26, claimant had been progressing with physical therapy, and was lifting and carrying up to 30 pounds of weight. (Tr. 252) She still had some discomfort in the left low back and posterior hip. Neurological exam was intact. There was no tenderness over the left greater trochanter.

Dr. Gaar opined that claimant was reaching a plateau, and increased her activities with PT and some work simulation. He planned to get a Functional Capacity Examination in anticipation of getting claimant to return to work.

**(3) Functional Capacity Evaluation ("FCE") by LeBlanc, Chamberlain & Martin Physical Services, Inc. dated September 8, 1999**. Claimant demonstrated

the ability to perform sedentary to light work.[3] (Tr. 131). She did not demonstrate the ability to return to the job of medical transport driver.

**(4) Records from The Family Clinic dated January 7 to April 11, 2000**. On January 7, claimant complained of pain and numbness which radiated down to the left thigh, and left arm pain and numbness. (Tr. 147). Examination of the lumbar spine was unremarkable. She had mild tenderness to palpation of the left greater trochanter which extended down into the mid-thigh. Deep tendon reflexes were 2+ bilaterally. Dr. Basile's assessment was left hip pain and possible inflammation of the ilia-tibial band. He prescribed Arthrotec and Darvocet for pain.

On February 28, Dr. Basile reported that claimant's CT of the left hip was completely normal. (Tr. 143). He prescribed Ultram, and referred her to Dr. Rees.

On April 11, claimant's left hip pain continued. (Tr. 142). Examination of the left hip was really unchanged. Dr. Basile opined that she was capable of doing a light duty position. He stated that he did not have anything else to offer. He prescribed a low salt diet and Darvocet as needed for pain.

**(5) Records from Dr. Stephen Rees dated April 3 to June 7, 2000**. On April 3, claimant complained of constant pain across the lumbosacral junction with some

---

[3]Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

radiation to the posterior buttocks area, burning and numbness down the lateral aspect of her left leg just distal to her knee, and arm numbness. (Tr. 272). She also stated that her leg had given out on her at times, which caused her to fall.

On examination, claimant was 5 feet 1 ½ inches tall and weighed 200 pounds. (Tr. 273). Her blood pressure was 140/106. (Tr. 274). Neurologically, her deep tendon reflexes were 2+ and symmetrical. Her motor exam was 5/5 throughout. She had an approximately 1.5 cm muscular measurement difference between her right and left lower extremities. Sensory examination was decreased to pin prick and light touch on the left side below the knee.

Straight leg raising was negative. Claimant had tenderness over the spinous process of her sacrum and exquisite tenderness over her trochanteric bursa. Her pelvis appeared to be 1.0 cm higher on the left than the right. She had no swelling over her left hip, but she did have a higher density of peripheral blood vessels in this area.

Dr. Rees' impression was left trochanteric bursitis with iliotibial band syndrome, early mild possible pyriformis syndrome, minimal pelvic obliquity, and normal neurological evaluation. He recommended a very aggressive manual medical program, a repeat injection into her greater trochanter and possibly into her attachment onto her sacrum, and vocational rehabilitation. (Tr. 275).

On June 7, claimant reported that she had had temporary relief with physical therapy, but no permanent relief. (Tr. 268). She had returned to sedentary work, but was not able to work that week because of increased pain across her low back into her left buttock, left hip, and the lateral aspect of her leg. She also complained of recent right elbow pain.

On examination, claimant's blood pressure was 158/110. She was tearful and crying. On neurological examination, her deep tendon reflexes were 2+ and symmetrical. Her strength was weakened on the left, which appeared likely to be pain. She had decreased sensation throughout her whole left lower extremity. She had tenderness in her left sacral sulcus, but her pelvis appeared level and was moving relatively well. She had a negative straight leg raising test, other than some hamstring tightness behind her knee. (Tr. 269).

Dr. Rees called her primary care physician, Dr. John Guidry, to increase her anti-hypertensive medication. He recommended a TENS unit, Lortab, and an anti-inflammatory gel to be used over her hip and sacroiliac joint. Dr. Rees noted that he was closing his outpatient office and would no longer be seeing patients. He suggested that claimant be followed up with trigger point injections once her blood pressure was under good control.

**(6) Records from Lafayette Bone & Joint Clinic dated June 26 to December 6, 2000**. On June 26, claimant saw Dr. Daniel L. Hodges for complaints of back, left hip and right elbow pain. (Tr. 159). On examination, she had good cervical spine and scapulohumeral range of motion. Neurologically, she had positive Tinel's bilaterally in the upper extremities. (Tr. 160). She had mid-line tenderness at the lumbosacral junction. Hyperextension, lateral bending and rotation caused pain. She had tenderness over the left hip consistent with trochanteric bursitis. In the distal extremities, she had good dorsalis pedis and posterior tibial pulses with essentially normal neurological exam.

Dr. Hodges' impression was mechanical low back pain, left trochanteric bursitis, chronic pain syndrome with concomitant anxiety and depression, and rule out connective tissue disease. He ordered a connective tissue profile, including thyroid and a bone scan, and prescribed Amitriptyline, Lortab, Tranxene, and Zoloft.

On July 10, claimant was sleeping better on Amitriptyline, which Dr. Hodges increased, as well as her Lortab. (Tr. 158). Her connective tissue profile was normal for thyroid, ANA and rheumatoid factor. Her sed rate was elevated to 42 with a pending bone scan. She also complained of bilateral pain and numbness, for which Dr. Hodges ordered NCVs.

On August 10, claimant was still having significant mechanical back complaints at the lumbosacral junction with pain into the left hip consistent with a low grade trochanteric bursitis. (Tr. 156). She continued to show signs of anxiety and depression. Neurologically, she was intact. Her range of motion was somewhat decreased, and she continued to have positive Tinel's bilaterally. A bone scan dated July 17 was normal. (Tr. 156-57). Dr. Hodges continued claimant on her medications and recommended NCVs.

On September 11, claimant was still having significant complaints of neck and upper back pain, hip pain, left trochanteric bursitis, and left-sided elbow pain. (Tr. 153). She had multiple trigger points throughout the trapezial groups extending into the rhomboid groups and the low back. Dr. Hodges did a series of injections, from which claimant had good overall relief.

On October 11, claimant reported several recent episodes with falls resulting in multiple contusions to her shoulders, elbows, wrists, hands and knees. (Tr. 152). She did not have overt neurologic findings. Dr. Hodges opined that she was suffering from significant hypertension that was pain mediated, for which he referred her to Dr. John Guidry. He also ordered a myelogram and CT, and gave her a prescription for a cane. She was basically on a no work schedule.

9

On November 8, Dr. Hodges reported that claimant's myelogram and CT revealed a left paracentral disk at L5-S1 with pressure effect on the left S1 nerve root, which he felt was the culprit of her ongoing pain. (Tr. 149, 151). He referred her to Dr. Cobb, and continued her on medications. He opined that at that point, she was "temporarily completely and totally disabled."

**(7) Reports from Dr. Charles Bramlet dated February 6 to December 5, 2001.** Claimant was referred by Dr. Hodges for increasing signs of depression and anxiety. (Tr. 173). She had significant symptoms of depression, including increasing sadness, irritability, agitation, decreasing sleep, decreasing memory and concentration, decreasing appetite, and loss of interest in doing pleasurable activities. She had been prescribed Zoloft by Dr. Hodges, but just stopped taking it. (Tr. 174).

On mental status examination, claimant's affect was sad. She described her mood as depressed. On cognitive exam, she was alert and oriented times four. She was goal directed, and her memory was intact. She had good concentration skills and good reasoning ability. Her insight and judgment were fair.

Dr. Bramlet opined that claimant met the criteria for chronic lower back pain and for adjustment disorder with significant symptoms of depression and anxiety, chronic in nature specifically relating to her chronic pain from the work injury. (Tr. 175). He recommended nutrition and exercises for her depression and anxiety, as

well as medications including Effexor.

On February 22, claimant reported that her depression was better. (Tr. 172). However, on March 29, she reported that she had become a lot worse. (Tr. 171). She was not reporting any problems at all with medications. Dr. Bramlet recommended more aggressive treatment consistent of individual psychotherapy, biofeedback, and medication management.

On April 12, Dr. Bramlet reported that claimant had continued to get worse. (Tr. 170). He noted that the recommended treatment had not been approved. He increased her Effexor, but stopped her Elavil.

On May 10, Dr. Bramlet reported that claimant's pain had become worse. However, she had been approved for individual and biofeedback. He was to see her every 8 to 10 weeks for medication management.

**(8) Records from Lafayette Bone & Joint Clinic dated January 8 to December 17, 2001**. Bilateral NCVs of the upper extremities dated April 5, 2001 revealed mild median nerve entrapment neuropathy at a level of the left carpal tunnel. (Tr. 189).

On May 21, 2001, claimant complained of low back, left hip and right elbow pain. (Tr. 181). She also had frequent headaches with occasional dizziness and blurred vision. Additionally, she reported stabbing pain in her neck which radiated

11

into the shoulders and down the spine to her tailbone and left leg, her left hip giving out which caused falling, and left carpal tunnel syndrome with numbness and tingling.

On examination, claimant was 5 feet 2 inches tall and weighed 195 pounds. (Tr. 182). She had restricted flexion with pain, mostly on the left side. Lateral bending was restricted. DTR's were 2+ and equal.

Claimant had a positive straight leg raise on the left at 75 to 80 degrees, negative on the right. She was tender over the bursa, and complained of right elbow pain. She was tender over the lateral epicondyle. She had full range of motion of the elbow.

Dr. Cobb's impression was herniated nucleus pulposus at L5-S1 on the left with some nerve-related symptoms. (Tr. 183). He recommended a microdiscectomy without fusion at L5-S1 on the left. He gave claimant injections into the right elbow and left hip bursa.

On August 20, 2001, claimant had no overall pain abatement after an LESI. (Tr. 179). On December 17, she continued to have significant complaints of lumbosacral pain consistent with lumbar radiculitis. (Tr. 176). She had recently fallen, and had some wrist discomfort. Dr. Hodges stated that they were still awaiting approval for further workup and evaluation as recommended by Dr. Cobb.

**(9) Records from Lafayette Bone & Joint Clinic dated January 28 to December 5, 2002**. On September 23, 2002, claimant complained of low back pain, occasional neck pain, and also pain into the left hip and leg. (Tr. 204). On examination, she was 5 feet 1 inch tall and weighed 173 pounds. (Tr. 205). She was using a cane to ambulate. She had normal posture of the lumbar spine and essentially full range of motion. DTR's were 2+ and equal. Motor and sensory function was normal. Claimant had no weakness in the lower extremities. Straight leg raise testing was negative, with pulling in the hip on the left.

Dr. Cobb's impression was herniated nucleus pulposus at L5-S1 on the left, no real signs of instability, and chronic post-traumatic lumbar pain syndrome. He recommended a discectomy at L5-S1 on the left without fusion, and continuing treatment with Dr. Hodges until surgery could be scheduled.

On December 4, 2002, Dr. Cobb reported that an MRI done on November 26, 2002 was normal. (Tr. 199, 201). He did not see a herniation or nerve root compression. (Tr. 199). However, he noted that the myelogram and CT from 2000 showed a left L5-S1 paracentral disc protrusion which would coincide with her symptoms.

On examination, claimant's straight leg raise was negative bilaterally. Her neurological exam was objectively normal.

Dr. Cobb noted that it was "a bit confusing" as to what was causing claimant's left hip pain. He recommended a lumbar discogram prior to recommending definitive care.

**(10) Claimant's Administrative Hearing Testimony**. At the hearing on May 4, 2004, claimant was 37 years old. (Tr. 29). She testified that she was five feet tall and weighed 195 pounds. (Tr. 30). She stated that her weight had gone up and down by 35 to 40 pounds.

Claimant was a high school graduate. (Tr. 31). She had completed training as a nurse's aide. She stated that she was no longer certified.

Regarding employment, claimant reported that she had worked in the meat department in a grocery store for about three years. (Tr. 31-32). She had also worked as a private nurse's aide for the elderly. (Tr. 32). Additionally, she had worked for an ambulance service as a wheelchair van driver.

Claimant testified that she had been injured in 1999 after unloading a heavy patient from the wheelchair van. (Tr. 44). She reported that she received $1,000 per month in worker's compensation. (Tr. 30).

As to complaints, claimant testified that she had a lot of pain in her back and left hip. (Tr. 32). She stated that sitting more than 10 to 15 minutes aggravated the pain. (Tr. 33). She reported that she could only walk as far from the parking lot to

the courtroom. She said that she could lift maybe a half-gallon of milk because of carpal tunnel syndrome in the left hand, which caused her to drop things. (Tr. 33, 45).

For her complaints, claimant testified that she took Lortab, Wellbutrin, Lexapro, Skelaxin, blood pressure medication, and Sonata for sleep. (Tr. 34, 40). She testified that the medicines took "the edge off," but did not get rid of the pain. (Tr. 35). She said that she had side effects, including weight gain and feeling "like a zombie sometimes" from exhaustion. (Tr. 41). She also had been using a cane for about two years. (Tr. 39).

Additionally, claimant reported that she had been seeing Dr. Bramlett every three months and a social worker monthly for emotional problems. (Tr. 38). The social worker had advised claimant to be more active. However, claimant stated that she was not in an emotional state to be around a lot of people, because she became depressed and had crying spells a couple of times a week. (Tr. 38-39). She thought that her depression had stabilized to an extent since her treatment. (Tr. 39).

Regarding activities, claimant testified that she did not cook or do housework. (Tr. 35). She stated that she read for an hour and watched television about two to three hours a day. (Tr. 36). She reported that she drove very little, like to the post office. (Tr. 30, 36).

Additionally, claimant said that she had dogs and chickens, but did not feed the chickens anymore because her hip would give out. (Tr. 36). She testified that she had fallen about two weeks prior after her hip gave out. (Tr. 44). She reported that she needed assistance in the bathroom because of her problems. (Tr. 45).

**(11) Administrative Hearing Testimony of Beverly Prestonback, Vocational Expert ("VE").** The ALJ asked Ms. Prestonback to assume a claimant of the same age, education and work experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand/walk for about six hours in an eight-hour day; could sit for six hours; could not do complex or detailed work, but could do work which required that she follow simple and two step instructions, and required limited interaction with the general public where she was a little more comfortable working with things rather than people because of emotional problems. (Tr. 48). In response, the VE identified her past light work as a produce packer, as well as shipping and receiving clerk, of which there were 251,000 light jobs available nationally and 2,100 statewide; light stock and inventory clerk, of which there 202,000 jobs nationally and 2,700 statewide; sedentary stock and inventory clerk, of which there were 32,500 jobs nationally and 438 statewide; light general office clerk, of which there were 342,000 jobs nationally and 4,600 statewide, and sedentary office clerk, of which there were 329,000 jobs nationally and 4,400 statewide. (Tr. 49).

16

When the ALJ asked whether claimant's need to lie down for an hour-and-a-half because of pain would affect her ability to do these jobs, the VE testified that an employer would not tolerate that. (Tr. 50). The ALJ also asked whether claimant would be allowed to do these jobs if she had to make postural changes every 10 to 15 minutes, to which the VE responded that she would not. Finally, the ALJ asked whether she would be able to do this work if she had crying spells a couple of times a week which could last up to one hour, to which Ms. Prestonback responded that she would not. (Tr. 50-51).

**(12) The ALJ's Findings are Entitled to Deference**. Claimant argues that the ALJ erred: (1) in failing to find that she was disabled; (2) in failing to find that she was disabled for a time and entitled to a closed period of disability benefits, and (3) in finding that claimant's testimony and complaints of pain were not credible.

As to the first two arguments, claimant argues there is no "concrete medical evidence" that she could do any light or sedentary work. (rec. doc. 8, p. 9). Specifically, she asserts that the ALJ afforded more weight to the opinions of non-treating physicians who performed consultative examinations. (rec. doc. 8, p. 11). She also contends that her medications caused a lot of adverse side effects, which in turn caused anxiety and depression. (rec. doc. 8, p. 7).

Regarding the first contention, the record reflects that the ALJ *did* consider the opinions of claimant's treating physicians in finding that she had the ability to perform light or sedentary work. (emphasis added). To reiterate, because claimant is insured for disability benefits through December 31, 1999, she must establish disability on or prior to that date. (Tr. 15). The ALJ noted that while Dr. Hodges had found claimant unfit for duty because of a disc herniation causing pressure on the nerve root, he had not examined claimant prior to June 26, 2000. (Tr. 18). The ALJ observed that all diagnostic testing prior to that date had been interpreted as normal. This finding is supported by the records from claimant's treating orthopedist, Dr. Gaar, as well as her treating physician, Dr. Basile, who reported that claimant's x-rays, MRI and CT scan were normal. (Tr. 135, 143, 257, 259). In fact, the ALJ noted that Dr. Cobb had later reported that the MRI of November 26, 2002, was normal and showed no herniation or nerve root compression. (Tr. 18, 199, 201).

Contrary to claimant's argument, the records from claimant's treating physicians during the relevant time period establish that claimant had the ability to perform light work. At his last examination of claimant on July 26, 1999, Dr. Gaar noted that claimant was progressing with physical therapy and was lifting and carrying up to 30 pounds. (Tr. 252). He also ordered a functional capacity evaluation "in anticipation of getting her to return to some work." The FCE dated September 8,

1999 showed that claimant had the ability to perform sedentary to light work. (Tr. 131).

Additionally, Dr. Basile determined on April 11, 2000 that claimant was capable of performing light duty. (Tr. 142). Further, the records of other examining physicians, including Dr. Wayne T. Lindemann's report dated February 14, 2000 and Dr. G. Gregory Gidman's report dated February 6, 2003, establish that claimant was capable of light duty. (Tr. 232, 298). Accordingly, claimant's assertion lacks merit.

Next, claimant argues that the ALJ erred in considering her credibility. (rec. doc. 8, pp. 9-12). The record reflects that the ALJ specifically evaluated claimant's testimony at the hearing, including her complaints of pain. (Tr. 18-19). However, he noted that claimant did not have any of the stigmata frequently observed in a patient who suffers from constant, unremitting pain. (Tr. 19). It is well settled that the absence of objective factors indicating the existence of severe pain -- such as limitations in the range of motion, muscular atrophy, or impairment of general nutrition, could itself justify the ALJ's conclusion. *Hollis v. Bowen*, 837 F.2d 1378,1384 (5th Cir. 1988).

Additionally, the ALJ discredited her testimony regarding side effects from medication. (Tr. 20). At the hearing, claimant complained that the medications made her feel "like a zombie" sometimes. (Tr. 41). However, the ALJ noted that

these complaints were documented in the medical records. (Tr. 20). In fact, Dr. Bramlet observed that she was "not reporting any problems at all with medications." (Tr. 171). Accordingly, the ALJ's assessment as to claimant's credibility is entitled to great deference. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

Finally, claimant asserts that there has been no determination that she could hold whatever job he finds for a significant period of time, citing *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). (rec. doc. 8, p. 11). However, since the issuance of its decision in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). As the court stated in *Frank*:

> Watson requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if [plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. **At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time.** An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will

20

be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id.* at 619.

Here, claimant has not demonstrated that her symptoms were of sufficient frequency or severity to prevent her from holding a job for a significant period of time during the relevant period as required by *Watson*. As noted by the ALJ, the objective evidence does not support the severity of the complaints alleged by claimant. (Tr. 20). Thus, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS**

REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed this _5_ day of _September_, 2005, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT:
DATE: 9-6-05
BY: abl
TO: RFI
CnH